UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| HENRY TORRES, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3:12-CV-00309 |
| | § | |
| INTERNATIONAL LONGSH 1665, *et al*, | § | |
| | § | |
| | § | |
| Defendants. | | |

# **MEMORANDUM AND ORDER**

Plaintiff Henry Torres is a longshoreman. For about a decade, he has worked out of various union hiring halls on the Texas Gulf Coast, including International Longshoremen's Association Local 1665 in Galveston. From approximately 2003 to 2010, Local 1665 did not admit any new members (a nonmember longshoreman can still receive work assignments from the union, and Torres did). Torres and others were allowed to join the union in 2010, but he contends that even after becoming a member he was discriminated against in work assignments because of his Hispanic origin. He filed this lawsuit against Local 1665 and the regional body of the International Longshoreman's Association, the South Atlantic and Gulf Coast District. Both defendants have moved for summary judgment.

**I.    BACKGROUND**

The Port of Galveston was the busiest port on the Gulf Coast and believed to be the second busiest in the country behind New York prior to the 1900 Storm. In the late nineteenth century, Galveston was the leading exporter of cotton, and also a leading port for the export of cattle, rice, and other commodities.

Times have changed. As a result of the 1900 Storm and the development of the Houston Ship Channel, Houston has long since overtaken Galveston as the Texas port of choice. In 2011, for example, Houston accounted for approximately 237.8 million short tons of cargo compared to Galveston's 13.7 million. The decline in shipping in Galveston has also affected the city's once robust longshoremen unions.[1]

Henry Torres has worked as a longshoreman in the Galveston and Houston areas for his entire adult life. Longshoremen receive work assignments through union hiring halls. Longshoremen need not, however, be union members to work out of union halls because Texas is a right-to-work state. One such hiring hall in Galveston belongs to a local chapter of the International Longshoremen's Association: Local 1665. Known as the Clerks and Checkers' Union—its

---

[1] It is true, as Torres points out, that there is a long history of racial discrimination by longshoremen unions in Galveston. Some unions, though not Local 1665, were subject to federal court supervision because of that history. The case law governing this case, however, does not allow that history (even if attributable to Local 1665) to inform the individualized *prima facie McDonnell Douglas* inquiry that this Court finds dispositive.

members are involved in checking the cargo entering and leaving the port, Local 1665 falls under the authority of the South Atlantic Gulf Coast District for the International Longshoremen's Association.[2]

A longshoreman's work varies day-to-day depending on a variety of factors including available jobs and personal choice. Longshoremen are not required to work any particular days or hours.  If a longshoreman wants to work and work is available, he need only make himself available for referral.  Different jobs and different shifts have different pay rates.  Local 1665 assigns work to longshoremen on the basis of seniority.  The seniority system has two tiers: numbered seniority classes and "casuals."  Union membership is not determinative of seniority; one can be a member of the union and still be considered a casual for seniority purposes.  Only union members, however, are assigned seniority class years, something Local 1665 does periodically.  There is no seniority amongst casuals: they are placed on the day's list by a first-come-first-served basis. When assigning work for a particular job, Local 1665 goes down the list of available workers, first giving jobs to those with the highest seniority in order of class number, then—if the job has enough room—moving down through the list of casuals in the order they put themselves on the list for the day.  If a worker misses the call for work or

---

[2] The South Atlantic Gulf Coast District had less involvement in the actions Torres complains about, in particularly the daily work assignments, than did Local 1665.  This opinion analyzes Torres's discrimination claims on the assumption that the challenged decisions can be attributed to the District, however, because the claims fail even under that assumption.

declines that job, Local 1665 goes on to the next worker on the list until the job has been fully staffed.

Torres began inquiring about joining ILA Local 1665 in 2002. But Local 1665 did not admit any new members between when Torres first began trying to join and his eventual admission into the union in 2010. During that time, Torres still received assignments from Local 1665 as a casual. Torres worked approximately 21,000 total hours between January 2000 and December 2013, with the lion's share of these coming from work out of a different Galveston union, ILA Local 20, and just over 2000 coming from work for Local 1665.

Torres complained to the District about Local 1665's refusal to admit new members several times between 2003 and 2010. In response, the District informed Local 1665 that it should begin admitting new members to its ranks.

When Torres was admitted into Local 1665 in 2010, he continued to work as a casual. In early 2012, Local 1665 granted Torres a seniority class number of 2009. Torres alleges that Local 1665 and the District both engaged in unlawful discrimination against him on the basis of his national origin in violation of section 1981 and Title VII by (1) denying him entry to the union, and (2) denying him work due to his Hispanic origin.

## II.   STANDARD OF REVIEW

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment. *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

## III.   ANALYSIS

### A.   Claims under Title VII and Section 1981[3]

Although it is generally used to bring claims against employers, Title VII contains a separate provision applicable to labor organizations. Under this provision:

---

[3] Torres's Complaint alleges only that he was discriminated against because of his Hispanic national origin.  *See* Docket Entry No. 1.  The Supreme Court has held that section 1981 does not provide a cause of action based "solely on the place or nation of [a plaintiff's] origin."  *See St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987).  The Court does not, however, need to decide whether the complaint can plausibly be read to allege race discrimination because Title VII and section 1981 are analyzed under the same framework.  *See Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745*, 660 F.3d 211, 213 (5th Cir. 2011) ("The Supreme Court has held that the burden-shifting framework developed in the context of Title VII in *McDonnell Douglas Corp. v. Green*, also applies to claims of racial discrimination under § 1981." (citations omitted)).  Therefore, the Court will assume that section 1981 and its longer statute of limitations applies because Torres cannot establish a circumstantial case even under those conditions.

> It shall be an unlawful employment practice for a labor organization:
>
> (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
> (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
> (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section

42 U.S.C. § 2000e-2(c). Bona fide seniority systems were specifically exempted from being considered unlawful under Title VII. 42 U.S.C. §2000e-2(h) ("Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race . . . or national origin . . . .").

In *Teamsters v. United States*, the Supreme Court held that "the unmistakable purpose of § 703(h) was to make clear that the routine application of a bona fide seniority system would not be unlawful under Title VII." 431 U.S. 324, 352 (1977). "Unlike other methods of allocating employment benefits and opportunities, such as subjective evaluations or educational requirements, the

principal feature of any and every 'seniority system' is that preferential treatment is dispensed on the basis of some measure of time served in employment." *California Brewers Ass'n v. Bryant*, 444 U.S. 598, 606 (1980). Accordingly, to show discrimination Torres must produce evidence that would show the union was making assignments not on the basis of seniority but instead on the basis of national origin.

One way in which Torres could do so would be to show that he was treated differently from a comparable employee of equal seniority. Such a claim would be evaluated under the framework that typically applies to Title VII claims brought against employers: the *McDonnell Douglas* burden-shifting framework, under which courts analyze whether circumstantial evidence of discrimination allows an inference of discrimination sufficient to defeat survive summary judgment. *See Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745*, 660 F.3d 211, 214 (5th Cir. 2011) (discussing application of *McDonnell Douglas* to discrimination claims brought against unions). Under *McDonnell Douglas*, the plaintiff first has the burden to establish a prima facie case of discrimination. *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the allegedly discriminatory action. *Id.* (quoting

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If a defendant advances such a justification, then the burden shifts back to the plaintiff to demonstrate that the proffered reason is not the true reason for the action, but rather is a pretext for discrimination. *Reeves*, 530 U.S. at 143 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). To establish a prima facie case, a plaintiff must show that he "(1) is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009) (citing *McDonnell Douglas*, 411 U.S. at 802).

Defendants do not dispute that Torres is Hispanic, a protected class, and was subject to adverse union actions—first not being admitted to the union and then not receiving as much work as he would have liked. Defendants do, however, contest whether Torres has produced sufficient evidence to show that similarly situated individuals were treated more favorably.

Recent Fifth Circuit opinions expound on the requirement that "an employee who proffers a fellow employee as a comparator [must] demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'"

*Id.* at 260 (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)). The Fifth Circuit has warned, however, that "nearly identical" is not "synonymous with 'identical.'" *Id*. A "requirement of complete or total identity rather than near identity would be essentially insurmountable . . . ." *Id.*

### 1. Torres fails to identify a single comparator for his union admission claim.

It is undisputed that no one was admitted to Local 1665 during the complained-about time period. Torres himself testified at his deposition that "for seven years, they did not let anybody in that Union." Torres Depo. at 51. Local 1665 contends that it did not admit new members during this period because the port was not that busy. This is a race-neutral reason, but the burden is not on Local 1665 to provide an explanation until Torres has established his prima facie case. The fact that no one was admitted during the relevant time period, and that Torres was among the first group of 17 new members admitted in 2010, prevents him from doing so. Absent direct evidence of anti-Hispanic animus, Torres must show that Local 1665 treated a non-Hispanic more favorably. Because no one, of any race, was admitted to Local 1665 during the time Torres was denied admission, he does not present evidence from which a jury could infer discrimination and his claim based on denial of union membership must be dismissed.

### 2. Torres does not show discriminatory work assignment on the basis of anything other than seniority.

Torres argues, however, that apart from the union membership issue, he was denied work based on his national origin. He does not submit any evidence of direct discrimination on this point or seek to establish discrimination under a disparate impact theory. This claim therefore also comes down to whether he can establish a circumstantial case of disparate treatment under *McDonnell Douglas*, which requires Torres has to identify a non-Hispanic longshoreman of similar or less seniority who received more assignments.

Torres identifies Micah Dickens—son of District Secretary–Treasurer Michael Dickens—as "an appropriate comparable." Docket Entry No. 30 at 18. Dickens worked about 12,700 total hours out of four different ILA local chapters. Like Torres, Dickens accumulated the majority out of a different local, in his case, Houston ILA Local 1351.

At the April 1 docket call, the Court instructed Plaintiff to produce the specific log entries he believed proved discriminatory work assignment. In response, Torres filed a summary of which dates he believed exhibited a departure from Local 1665's established bona fide seniority system to his detriment. *See* Docket Entry Nos. 43, 43-1. As Defendants point out in their replies to this filing, however, none of these dates involve Local 1665 denying Torres work in a manner inconsistent with the seniority system. *See* Docket Entry Nos. 44 & 45.

The dates flagged by Plaintiff involve the following situations:

- Torres working when Dickens was not on the board *see, e.g.*, Docket Entry No. 32-1 at 15–16;

- Dickens working on dates when he was on the board but Torres was not, *see, e.g.*, Docket Entry No. 32-2 at 1–4;

- Neither Torres nor Dickens being on the board, *see, e.g.*, Docket Entry Nos. 32-7 at 21; 32-8 at 3;

- no casuals being referred, *see, e.g.*, Docket Entry No. 32-9 at 18;

- Torres refusing a job or not answering the call, *see, e.g.*, Docket Entry Nos. 32-7 at 16; 32-8 at 1, 5, 7, 9, 15;

- Dickens being called out because he was ahead of Torres on the "first come, first serve" casual list as a result of placing himself on the casual list earlier than Torres did, *see, e.g.*, Docket Entry No. 32-8 at 11;

- Torres being called out because he was ahead of Dickens on the board, *see, e.g.*, Docket Entry Nos. 32-2 at 9–10; 32-8 at 17–18;

- Torres not being reached due to his position on the board because he was one of the last casuals to place his name on the board, *see, e.g.*, Docket Entry No. 32-8 at 13;

- Torres and Dickens both working, *see, e.g.*, Docket Entry No. 31-13 at 18, 32-2 at 5–8; or,

- on the single identified day when Torres and Dickens were no longer casuals—Torres having been awarded a 2009 classification and Dickens a 2010 classification in February 2012—Torres refused the job he was offered and worked instead out of ILA Local 20, Docket Entry Nos. 32-11 at 1; 31-1 at 7.

Because Torres has failed to point to a single instance of having been denied work in favor of a non-Hispanic in a manner inconsistent with Local 1665's bona fide

seniority system, he does not make out a *prima facie* case of discrimination.

In evaluating the *prima facie* case, the relevant analysis is that undertaken above in which Torres must show a similarly situated person of different national origin who was treated more favorably. If he had been able to do so, he would have established a *prima facie* case even if Local 1665 could identify other Hispanics who were treated more favorably. A company, for example, employing a handful of members of a protected class at high-ranking positions does not insulate itself from Title VII liability if lower level workers of the same group can put forth evidence of discrimination. Local 1665's argument that the two of its members receiving the most work were Hispanic, *see* Docket Entry No. 23 at 21–22, thus does not directly affect the *prima facie* analysis. It is also the case, however, that the *McDonnell-Douglas* test is just an evidentiary framework that assists courts in determining the ultimate question whether there is sufficient circumstantial evidence from which a reasonable jury could find discrimination. *See Reeves*, 530 U.S. at 142–55. The fact that Hispanic members are among the top recipients of Local 1665's work thus reinforces the conclusion that must be drawn from Torres's inability to identify a similarly situated non-Hispanic who received more work than he did under similar circumstances: that the undisputed facts of this case do not support a either a Title VII or section 1981 violation.

## IV. CONCLUSION

For these reasons, Defendants' Motions for Summary Judgment (Docket Entry Nos. 21 & 23) are **GRANTED**. A separate final judgment will enter.

**SIGNED** this 30th day of September, 2014.

_____
Gregg Costa
United States Circuit Judge[*]

---

[*] Sitting by designation.